UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v. | ) CRIMINAL NO. 04-10306-PBS |
| | ) |
| **TREVOR CHARLTON** | ) |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE**

The government respectfully opposes Defendant's Motion to Suppress Statements and Physical Evidence (the "Motion"). For the reasons that follow, the Court should deny the Motion.

**FACTS**

The government provides herewith a summary of the facts it expects to adduce at the hearing on the Motion. (The government reserves the right to elicit additional facts at the hearing itself.)

On July 25, 2004, Brockton Police Officer Michael Scanlon responded to 83 Forest Avenue on a report that a man had been shot. He spoke with a man named Vasco Andrade, who told him that when he got home he saw a female named Lisa Sanders and a male named Trevor Charlton, a/k/a "Kurt" or "Kirk," talking in the driveway. Andrade went inside and began to eat dinner, but was interrupted by a woman named Lillian Gomes, girlfriend of Andrade's brother Pedro, who said Pedro had been shot. They ran to a nearby street corner, found Pedro standing there bleeding, and got him a ride to the hospital, where Pedro ultimately refused to cooperate with the police investigation.

Officer Scanlon then spoke with Lisa Sanders. She told the officer that she was smoking a cigarette in the driveway when "Kurt" drove in. He got out of the car and they began to talk. Lillian Gomes arrived and announced, "Pedro got stabbed." "Kurt" responded: "Is that the dude I just stabbed?" Sanders told Officer Scanlon that a yellow cab then pulled up, and "Kurt" entered it and left.

Officer Scanlon did not see any blood at 83 Forest Avenue, but did see blood drops on the nearby porch of the building in which Pedro Andrade lived, as well as at the entrance to a building at the intersection where Pedro's bother located him before getting him a ride to the hospital.

Detective Delehoy, accompanied by Detectives Carde and Hilliard, was on his way to 83 Forest Avenue when he received information over the radio that the suspect, "Kirk," had gotten into a Yellow Cab and was on his way to 37 Ellsworth Street wearing a white shirt and glasses. They went to 37 Ellsworth Street.

When they arrived, another detective was standing just outside the door of his police vehicle. Officer Delehoy saw five black males, four of whom he knew, standing near the building. One of the males was the defendant, whose alias Detective Delehoy knew to be "Kirk." He was wearing a white tank top and jeans. The defendant was standing near a concrete pillar at the bottom

of the steps leading to the building.  There was another white shirt on the concrete pillar next to the defendant.

The police instructed all five males out to the sidewalk area.  Detective Delehoy went to inspect the white shirt, which felt heavy.  He manipulated the shirt and saw the grip of a handgun.  Detective Delehoy advised the other members of the police to place handcuffs on the men on the sidewalk for safety.  Detective Hilliard, wearing gloves, then rendered the handgun safe, observing that there was a round in the chamber and that the gun was cocked.

Detective Delehoy also observed that the white shirt had what appeared to be blood stains on it.

The defendant was taken to Sergeant Linehan's crusier.  Sergeant Linehan frisked the defendant and located a knife in his back pocket.  Once in the cruiser, Sergeant Linehan read the defendant his <u>Miranda</u> rights, which he waived.  The defendant initially told the detective he had been on the third floor of 37 Ellsworth Street with his girlfriend, whom he knew by first name only.  The Sergeant told the defendant he would check the story with the girlfriend, and the defendant told the Sergeant to wait, that he wanted to tell the truth.  He then told the Sergeant, in substance, that he did not shoot anybody but had stabbed somebody.  He said that a girl he was trying to "get with" called him and asked him to come over to 83 Forest Avenue.  He parked

his car in the driveway and met up with the girl, Lisa. As he was talking with Lisa, he felt someone run up on him and shove his face toward the dashboard. The assailant told the defendant to put his hands on the wheel. The defendant broke away and pulled a knife from his rear pants pocket, using it to stab the man who was assaulting him. The other man fled and the defendant tried to find his keys to drive away, but they were gone. The defendant then fled on foot.

Sergeant Linehan asked the defendant about the white t-shirt he was wearing on his head. The defendant told him he did not have another shirt. The Sergeant asked the defendant why he would not tell the truth about this, indicating that the shirt recovered from the steps was the only shirt that had blood on it. The defendant then admitted that both the shirt and a hat found with it were his.

At the police station, Detectives Delehoy and Hilliard spoke further with the defendant. They asked the defendant about the gun. The defendant said that, after the altercation, he returned to 37 Ellsworth Street and retrieved the gun from the hallway, where it was hidden in a brown bag. The defendant indicated that he had not had it with him before but came back to get it because his life was in danger. He said that he had just wrapped the gun in his clothing and walked down the front steps when the first detective arrived.

**ARGUMENT**

The defendant argues that evidence seized from his person – the knife – and the statements he made to the police must be suppressed. He claims, first, that both were the result of an arrest for which probable cause was lacking. He claims, second, that he did not receive his Miranda warnings before making admissions to Sergeant Linehan, and that all of his statements must thus be suppressed. The Court should reject these arguments.

**I.     THE ARREST WAS SUPPORTED BY PROBABLE CAUSE**

The defendant argues that the police had effected a de facto arrest without probable cause when they ordered him to step forward onto the sidewalk at 37 Ellsworth Street. In so doing, the defendant contradicts the foregoing recitation of facts by claiming that the defendant was handcuffed at the time he was ordered to move forward to the sidewalk, and that it was at this point that the arrest occurred. As demonstrated below, the Motion fails on either version of the facts.

The police may make a warrantless arrest when they have probable cause to believe that a particular person has committed a felony offense. See Carroll v. United States, 267 U.S. 132 (1925)(warrantless arrest permissible when probable cause exists to believe defendant has committed felony); see also Beck v. Ohio, 379 U.S. 89, 91 (1964)(police have probable cause to make

warrantless arrest when they have knowledge of facts and circumstances sufficient to warrant a belief by a prudent person that an offense has been committed by the person to be arrested). Here, by the time Detective Delehoy arrived in front of 37 Ellsworth Street, the police had already spoken with witnesses from the scene of the stabbing.  Based on those conversations, including the defendant's admission, as related by Lisa Sanders, that the defendant had just stabbed somebody, the police had probable cause to believe that the defendant had committed the felony of assault and battery with a dangerous weapon, among other offenses.  Accordingly, even assuming arguendo that the police handcuffed the defendant immediately upon their arrival at 37 Ellsworth Street, and even assuming that this constituted an arrest, such arrest was supported by probable cause.

In fact, however, the police initially handcuffed the defendant and the others, not because they were effecting an arrest, but rather for safety reasons during a fluid and quickly evolving Terry stop.  Neither the drawing of a weapon nor the handcuffing of a suspect automatically transforms an investigative stop into a full-blown arrest.  See, e.g., United States v. Fornia-Castillo, ___F.3d___, 2005 WL 1253281 *8-9 (1st Cir. May 27, 2005)(suspect not under arrest where weapon drawn and suspect handcuffed where stop occurred on side of busy public street with heavy volume of traffic, officer who handcuffed

suspect initially only officer on scene, handcuffs removed after ten or fifteen minutes, and interaction not confrontational or bellicose). Here, the police were investigating a stabbing that initially had been reported as a shooting. Upon locating the defendant, who had been identified as the suspect, the police observed a shirt in the defendant's immediate vicinity, and almost immediately determined that it concealed a handgun. At this point, the police plainly were acting prudently, and in furtherance not only of their own protection, but also that of the defendant and the others, in handcuffing the five males pending further investigation. See, e.g., United States v. Acosta-Colon, 157 F.3d 9, 17 (1st Cir. 1998)(finding use of handcuffs inappropriate in particular case but recognizing use of handcuffs in Terry context permissible when necessary to promote safety). When that further investigation immediately revealed blood stains on the same shirt that was hiding the gun, the police, even assuming they lacked probable cause to arrest the defendant upon their initial arrival, certainly now possessed it.

Accordingly, the knife recovered subsequently from the defendant, and the statements he subsequently made, should not be suppressed.

## II. **THE DEFENDANT RECEIVED HIS MIRANDA RIGHTS**

The defendant next argues that the police failed to give him his Miranda rights before he made his initial statements to

Sergeant Linehan. However, as indicated above, the defendant did receive these warnings, and did waive his rights thereunder, and thus his effort to suppress his statements on this ground should be denied.

Moreover, even assuming arguendo that the defendant did not receive his Miranda warnings in Sergeant Linehan's car, the government disagrees that his station house statements should be suppressed. The defendant admits that he was given his Miranda warnings as part of the booking process. It was after this that Detectives Delehoy and Hilliard spoke to him. Unlike the situation in Missouri v. Seybert, 124 S.Ct. 2601 (2004), the two conversations were not part of a coordinated and continuing interrogation. Indeed, the defendant made no admissions about the gun itself in the car with Sergeant Linehan, while virtually the entirety of his conversation with the detectives at the station house concerned this topic. There is thus no evidence, as there was in Seybert, that the police were intentionally depriving the defendant of his Miranda rights during an initial interview, with the hope that he would repeat the same admissions after being advised of his rights. Thus, at least the station house statements, which concededly came after the Miranda warnings, should be admitted.

**CONCLUSION**

For the foregoing reasons, this Court should deny the Motion.

                                      Respectfully submitted,

                                      MICHAEL J. SULLIVAN
                                      United States Attorney

                    By:   /s/Robert E. Richardson
                          Robert E. Richardson
                          Assistant U.S. Attorney


**CERTIFICATE OF SERVICE**

Suffolk, ss.                             Boston, Massachusetts
                                       June 6, 2005

I, ROBERT E. RICHARDSON, hereby certify that I have caused a true copy of the foregoing to be served by electronic filing on J. Martin Richey, Federal Defender Office, 408 Atlantic Avenue, 3rd Floor, Boston, MA 02210.

                                      /s/Robert E. Richardson
                                      ROBERT E. RICHARDSON
                                      Assistant U.S. Attorney