**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO.  04-10306-PBS** |
| | ) | |
| **TREVOR CHARLTON** | ) | |

**GOVERNMENT'S MOTION TO**
**OBTAIN DNA SAMPLES**

The United States of America hereby moves this Court, pursuant to the All Writs Act, 28 U.S.C. §1651(a), and the Fourth Amendment of the U.S. Constitution, for an Order compelling the taking of DNA samples (in the form of oral swabs) from Defendant Trevor Charlton (the "defendant").  Based on facts adduced at the suppression hearing in this matter, probable cause exists to conclude that such samples constitute evidence of a crime.

**I.    Background and Facts**

As the Court is aware based on testimony at the suppression hearing, on the evening of July 25, 2004, Brockton Police Officer Michael Scanlon responded to 83 Forest Avenue on a report (erroneous, as it turned out) that a man had been shot.  Two other officers were already there when Officer Scanlon arrived, and one of them was in the process of reporting over the radio that a suspect named "Kurt" had left the scene in a Yellow Cab.  Officer Scanlon  spoke with a man named Vasco Andrade, who told him that when he got home he saw a female named Lisa Sanders and a male whom he knew as "Kurt" talking in the driveway.  Andrade went inside and began to eat dinner, but was interrupted by a woman named Lillian Gomes, girlfriend of Andrade's brother Pedro, who told Vasco that Pedro had been shot.  They ran to a nearby street corner, found Pedro standing there bleeding, and got him a ride to the hospital, where Pedro ultimately refused to cooperate with the police investigation.

Officer Scanlon then spoke with Lisa Sanders.  She told the officer that she was smoking a cigarette in the driveway when "Kurt" drove in.  He got out of the car and they began to talk. Lillian Gomes arrived and announced, "Pedro got stabbed."  "Kurt" responded: "Is that the dude I just stabbed?"  Sanders told Officer Scanlon that a Yellow Cab then pulled up, and "Kurt"

entered it and left.

Brockton Police Detective David Delehoy, accompanied by Detectives Carde and Hilliard, was on his way to 83 Forest Avenue to respond to the shooting call when he received information over the radio that the suspect, whose name Detective Delehoy heard as "Kirk," but which Detective Hilliard heard as "Kurt," had gotten into a Yellow Cab and was on his way to 37 Ellsworth Street wearing a white shirt and glasses. Each of the detectives believed the individual being referred to was the defendant, whom they knew from prior encounters. They went to 37 Ellsworth Street.

When they arrived, another detective and a lieutenant were standing just outside the doors of their respective vehicles. Detective Delehoy saw five black males, four of whom he knew, standing near the building. One of the males was the defendant, who was standing near a concrete pillar at the bottom of the steps leading to the building. There was a white shirt on the concrete pillar next to the defendant. The police instructed all five males out to the sidewalk area. Detective Delehoy went to inspect the white shirt, which felt heavy. He manipulated the shirt and saw the grip of a handgun. Detective Delehoy advised the other members of the police to place handcuffs on the men on the sidewalk for safety. Detective Hilliard, wearing gloves, then rendered the handgun safe, observing that there was a round in the chamber and that the gun was cocked. Detective Delehoy then observed that the white shirt had what appeared to be blood stains on it.

The defendant was taken to Sergeant Linehan's crusier. Sergeant Linehan frisked the defendant and located a knife in his back pocket. Once in the cruiser, Sergeant Linehan read the defendant his Miranda rights, which he waived. The defendant initially told the detective he had been on the third floor of 37 Ellsworth Street with his girlfriend, whom he knew by first name only. The Sergeant told the defendant he would check the story with the girlfriend, and the defendant told the Sergeant to wait, that he wanted to tell the truth. He then told the Sergeant, in substance, that he did not shoot anybody but had stabbed somebody. He said that a girl he was

trying to "get with" called him and asked him to come over to 83 Forest Avenue. He parked his car in the driveway and as the girl came up to him he felt someone run up on him and shove his face toward the dashboard. The assailant told the defendant to put his hands on the wheel. The defendant broke away and pulled a knife from his rear pants pocket, using it to stab the man who was assaulting him. The other man fled and the defendant tried to find his keys to drive away, but they were gone. The defendant then fled on foot.

During this conversation, Detective Hilliard approached and told the Sergeant that a firearm and a magazine had been found on a pillar near the porch area in some white clothing and that the clothing had blood on it. Sergeant Linehan asked the defendant about the white t-shirt he was wearing on his head. The defendant told him he did not have another shirt. The Sergeant asked the defendant why he would not tell the truth about this, indicating that the shirt recovered from the steps was the only shirt that had blood on it. The defendant then admitted that both the shirt and a hat found with it were his.

At the police station, Detectives Delehoy and Hilliard spoke further with the defendant, after he had been advised of his <u>Miranda</u> rights a second time by Sergeant Linehan . Among other things, they asked the defendant about the gun. The defendant said that, after the altercation, he returned to 37 Ellsworth Street and retrieved the gun from the hallway, where it was hidden in a brown bag. The defendant indicated that he had not had it with him before but came back to get it because his life was in danger. He said that he had just wrapped the gun in his clothing and walked down the front steps when the first detective arrived.

Both the knife recovered from the defendant's rear pocket and the shirt in which the firearm was wrapped have human blood on them. The evidence set forth above links both items to both the defendant and to Pedro Andrade, whom the defendant admitting having stabbed (albeit in self defense). The evidence further establishes probable cause to believe that the blood is that of Pedro Andrade and/or the defendant. A sample of Pedro Andrade's blood was obtained when he was treated at the hospital. The government, by this Motion, seeks a DNA sample from

the defendant in the form of oral swabs for the purpose of a comparison of the defendant's and Andrade's DNA with the DNA contained in the blood on the knife and the shirt.

## II.     Argument

### A.     The Constitution permits the Court to issue the requested order.

The Fourth Amendment permits taking DNA samples from the defendant because the sampling is minimally intrusive, the defendant has a reduced expectation of privacy while he is in custody, and the government has established that there is probable cause to believe that the samples constitute evidence of a crime.  "The Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable."  Skinner v. Railway Labor Execs. Assn., 489 U.S. 602, 619 (1989) (citation omitted).  "What is reasonable . . . 'depends on all of the circumstances surrounding the search or seizure and the nature of the search and seizure itself.'  Thus, the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"  Id. (citations omitted).  In  Schmerber v. California, 384 U.S. 757 (1966), the Supreme Court noted that a person "has only a limited privacy interest in not having his blood tested" in the first place.  Schmerber v. California, 384 U.S. 771-772.  See also Dunn v. White, 880 F.2d 1188, 1194 (10th Cir. 1989)("[B]lood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." In addition, the Dunn court noted that, "in prison, an individual's 'expectation of privacy in his or her body is diminished.'").[1]

---

[1]Courts of appeal have followed the holdings of Skinner and Schmerber and reached conclusions consistent with Dunn.  For example, in Roe v. Marcotte, 193 F.2d 72 (2d Cir. 1999), the Second Circuit, citing Skinner, Schmerber and Dunn, upheld the constitutionality of a Connecticut statute that mandated the blood testing for DNA purposes of prisoners convicted of certain crimes.  As in Schmerber and Dunn, the Roe court found that blood testing constituted a "minimal" Fourth Amendment intrusion.

Other courts of appeal have reached similar outcomes.  See, e.g., Boling v. Romer, 101 F.3d 1336 (10th Cir. 1997) (compulsory DNA blood testing for prisoners was constitutional where blood testing was minimally intrusive and prisoners had diminished privacy rights); Rise v. Oregon, 59 F.3d 1556 (9th Cir. 1995) (mandatory blood DNA testing for certain convicted felons was constitutional where blood tests where minimally intrusive, prisoners had reduced

Nor does the securing of oral swab samples violate the Fifth Amendment privilege against self-incrimination.  Compelling the defendant to submit to minimally intrusive sampling is not the "forced extraction of testimonial or communicative evidence contemplated by the Fifth Amendment."  United States v. Thomann, 609 F.2d 560, 562 (1st Cir. 1979)(citing United States v. Wade, 388 U.S. 218 (1966) and Schmerber).  See also United States v. Ferrer, 1993 WL 501143, *1 (D. Puerto Rico 1993)(taking hair samples does not violate the Fifth Amendment).

The sampling in this matter will be minimally intrusive; it will not even require the breaking of the defendant's skin as is the case with blood samples.   As discussed above, courts have repeatedly recognized that sampling an inmate's blood is minimally intrusive.  Moreover, as the facts of record make clear, there is sufficient probable cause to issue an Order for the requested samples.

**B.    The All Writs Act empowers the Court to issue the requested order.**

The All Writs Act, Title 28, United States Code, Section 1651(a) states in full:

> The Supreme Court and all other courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

Id.  "Federal courts have long recognized that the purpose of the All Writs Act is to provide the instruments necessary to perform their duty, assuming those instruments are `agreeable' to the usages and principles of law."  United States v. Li, 55 F.3d 325, 328 (7th Cir. 1994)(citing Harris v. Nelson, 394 U.S. 286, 300 (1969)).

In Li, 55 F.3d at 328, the Government requested a post-indictment order seeking

---

privacy expectations and statute prescribed sampling only in a medically acceptable manner and limited recipients of test results); Jones v. Murray, 962 F.2d 302 (4th Cir. 1992) ("[P]ersons lawfully arrested on probable cause and detained lose a right of privacy from routine searches of the cavities of their bodies and their jail cells.").  See also United States v. Ward, 131 F.2d 335 (3d Cir. 1997) (permitting blood testing under federal statute which permits such testing for victims of certain violent sexual crimes, where the statute limited testing to situations where victim was at risk of transmission, with notice to the defendant, and with strict confidentiality requirements for the test results).

handwriting exemplars from the defendant from the district court.  The trial court issued the requested order, and the defendant complied.  Id.  On appeal, the defendant argued that the district court lacked the authority to issue such an order post-indictment.  Id.  The Seventh Circuit held that the district court had the authority under the All Writs Act to issue the requested order.  Id.  The court reasoned that "[c]ourts may rely on this statute to issue orders necessary for conducting factual inquiries."  Id.  The court concluded that "[t]he post-indictment nature of the order did not diminish the trial court's authority to issue the order" in any way.  Id. See also United States v. Jackman, 1997 WL 161948, *2 (D. Kan. 1997)(handwriting exemplar); Doe v. United States, 487 U.S. 201, 205 n.3 (1988)(consent directive); United States v. Rudy, 429 F.2d 993 (9th Cir. 1970) (handwriting exemplar).

As recently as August 4, 2004, the Chief Magistrate Judge for this District (Swartwood, C.M.J.), in ruling on a government motion for palm prints and DNA samples in the form of buccal swabs, stated, "Given that the Defendants are under arrest, it is doubtful that requiring the Defendants to submit to a DNA swab would implicate any Fourth Amendment concerns with respect to them."  August 4, 2004 Order at 5 (United States v. John Pakala, et al., Criminal Action No. 03-10317-JLT).  The Court further found that "a swab test involves minimal intrusion and is appropriate under the circumstances."  Id.

It is thus clear that the All Writs Act empowers this Court to order the taking of oral swab samples from the defendant.

## III. __Conclusion__

For the foregoing reasons, the government respectfully requests that the Court issue an

Order compelling the defendant to submit to DNA sampling in the form of oral swabs.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/Robert E. Richardson
ROBERT E. RICHARDSON
Assistant U.S. Attorney

### __CERTIFICATE OF SERVICE__

Suffolk, ss.                                      Boston, Massachusetts
                                                  August 10, 2005

I, ROBERT E. RICHARDSON, hereby certify that I have caused a true copy of the
foregoing to be served by electronic filing on J. Martin Richey, Federal Defender Office, 408
Atlantic Avenue, 3rd Floor, Boston, MA 02210.

/s/Robert E. Richardson
ROBERT E. RICHARDSON
Assistant U.S. Attorney
