UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   CRIMINAL NO. 04-10306-PBS |
| | ) |
| TREVOR CHARLTON | ) |

### GOVERNMENT'S MOTION IN LIMINE

The government respectfully submits herewith its motion in limine, seeking a ruling from this Court that evidence tending to show that the defendant has engaged in other criminal conduct is admissible at the trial of this matter. Specifically, the government seeks to introduce evidence that, shortly before the defendant was found in possession of the firearm charged in the indictment, he was involved in stabbing an individual named Pedro Andrade, evidence that was adduced without objection at the first trial of this matter. The government also seeks to introduce evidence that, in speaking to the police later that night, the defendant, among other things, told the police that he sold drugs.

The government also seeks a ruling precluding cross-examination regarding (1) the facts underlying certain convictions and arrests of one of its potential witnesses, and (2) information from closed Internal Affairs files relating to some of the potential police witnesses.

### BACKGROUND

The indictment charges the defendant Trevor Charlton (the

"defendant") with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). In support of this charge, the government will offer evidence that, on July 25, 2004, the defendant was involved in an altercation with a man named Pedro Andrade in front of 83 Forest Avenue in Brockton. Andrade (who has since been deported) approached the defendant, who was sitting in a car, and began choking him. The defendant responded by pulling out a knife and stabbing Andrade, with the ultimate result that Andrade stopped choking the defendant and ran from the scene.

The defendant had been talking with a young woman named Lisa Sanders when Andrade approached the defendant. Sanders knew the defendant by his nickname "Kurt." Sanders also knew Andrade (he was the brother of her step-father), but she had not recognized him, given the way he had been dressed. After Andrade left, Sanders saw the defendant open the glove compartment of the car, reach in, and remove something, and then get out of the car holding a black handgun. The defendant started to follow Andrade with the gun, but then stopped and hugged Sanders. He also placed a call on his cell phone, describing what had just happened to him, and had some conversation with some passersby. Soon thereafter, Liliana Gomes, Andrade's girlfriend, arrived, screaming that her boyfriend had been shot. The defendant asked whether Gomes was referring to the person he had just stabbed.

Gomes ran to the door of 83 Forest Avenue to try to speak with Andrade's bother.  Sanders turned around and saw the defendant getting into a cab and leave the scene in the cab.  Members of the Brockton Police Department thereafter arrived and began investigating.

The Brockton dispatcher put out a call regarding the incident at 83 Forest Avenue, which at that time was believed to have been a shooting.  Detective Delehoy, accompanied by Detectives Carde and Hilliard, was on his way to 83 Forest Avenue when he received information over the radio that the suspect, "Kirk," had gotten into a Yellow Cab and was on his way to 37 Ellsworth Street wearing a white shirt and glasses.  He and the other detectives went to 37 Ellsworth Street.

When they arrived, another detective was standing just outside the door of his police vehicle.  Officer Delehoy saw five black males, four of whom he knew, standing near the building.  One of the males was the defendant, whose nickname Detective Delehoy thought to be "Kirk."[1]  The defendant was wearing a white tank top and jeans.  The defendant was standing near a concrete pillar at the bottom of the steps leading to the building.  There was another white shirt on the concrete pillar next to the defendant.

---

[1] Detective Delehoy now understands the defendant's nickname to be "Kurt" and that he previously, including the night of July 25, 2004, had been mishearing it as "Kirk."

The police instructed all five males out to the sidewalk area.  Detective Delehoy went to inspect the white shirt, which felt heavy.  He manipulated the shirt and saw the grip of a handgun.  Detective Delehoy advised the other members of the police to place handcuffs on the men on the sidewalk for safety.  Detective Hilliard, wearing gloves, then rendered the handgun safe, observing that there was a round in the chamber and that the gun was cocked.  The gun was black.

Detective Delehoy also observed that the white shirt had what appeared to be blood stains on it.

The defendant was taken to Sergeant Linehan's cruiser.  Sergeant Linehan frisked the defendant and located a knife in his back pocket.  Once in the cruiser, Sergeant Linehan read the defendant his <u>Miranda</u> rights, which he waived.  The defendant initially told the detective he had been on the third floor of 37 Ellsworth Street with his girlfriend, whom he knew by first name only.  The Sergeant told the defendant he would check the story with the girlfriend, and the defendant told the Sergeant to wait, that he wanted to tell the truth.  He then told the Sergeant, in substance, that he did not shoot anybody but had stabbed somebody.  He said that a girl he was trying to "get with" called him and asked him to come over to 83 Forest Avenue.  He parked his car in the driveway and met up with the girl, Lisa.  As he was talking with Lisa, he felt someone run up on him and shove

his face toward the dashboard.  The assailant told the defendant to put his hands on the wheel.  The defendant broke away and pulled a knife from his rear pants pocket, using it to stab the man who was assaulting him.  The other man fled and the defendant tried to find his keys to drive away, but they were gone.  The defendant then fled on foot.

Sergeant Linehan asked the defendant about the white t-shirt he had been wearing on his head.  The defendant told him he did not have another shirt.  The Sergeant asked the defendant why he would not tell the truth about this, indicating that the shirt recovered from the steps was the only shirt that had blood on it.  The defendant then admitted that both the shirt and headware found with it were his.

At the police station, Detectives Delehoy and Hilliard spoke further with the defendant.  They asked the defendant about the gun.  The defendant said that, after the altercation, he returned to 37 Ellsworth Street and retrieved the gun from the hallway, where it was hidden in a brown bag.  The defendant indicated that he had not had it with him before but came back to get it because his life was in danger.  He said that he had just wrapped the gun in his clothing and walked down the front steps when the first detective arrived.  He also indicated in speaking with the detectives, among other things, that people thought he carried a lot of money because he sold drugs.

Members of the Brockton Police Department and the Plymouth Sheriff's Department responded to the hospital, where Andrade was being treated for the knife wounds.  A sample of his blood was taken.  The Massachusetts State Police Laboratory thereafter determined that there was human blood on both the knife and the shirt that had been wrapped around the gun.  They submitted a cutting from the shirt and a swab from the knife, along with Andrade's known blood sample, to Cellmark, a commercial DNA laboratory.  Cellmark determined that Andrade was the major contributor of DNA found on the shirt cutting and was the source of the blood found on the knife.

## ARGUMENT

Rule 404(b) provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident..." Fed. R. Evid. 404(b).  The First Circuit has recognized that the rule is to be interpreted broadly.  See United States v. Fields, 871 F.2d 188, 196 (1st cir. 1989)("'the range of relevancy outside the ban is almost infinite; and further, . . . the purposes are not mutually exclusive for the particular line of proof may fall within several of them'"), quoting McCormick, Evidence § 190, at

448 (Cleary, ed. 1992).

The First Circuit recognizes a two-step process for determining the admissibility of evidence under Rule 404(b). *See, e.g.*, United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996). First, this Court must determine whether the evidence offered is probative of, i.e., has "special relevance" to, a material issue other than character. Id.; *see also* United States v. Williams, 985 F.2d 634, 637 (1st Cir. 1993)(trial court must first determine whether evidence has any "special relevance" to material issue). If the evidence does have special relevance, the Court must conduct an analysis under Fed. R. Evid. 403 to determine whether the probative value of the proffered evidence is "substantially outweighed by the danger of unfair prejudice." Huddleston v. United States, 485 U.S. 681, 687 (1988); *see* United States v. Ferrer-Cruz, 899 F.2d 135, 138 (1st Cir. 1990)("similar act" evidence survives Rule 404(b)'s absolute ban against "bad character" evidence where at least one permissible inference possible); United States v. Mazza, 792 F.2d 1210, 1222 (1st Cir. 1986)(where "prior act" evidence proves relevant to legitimate issue, such evidence admissible subject only to balancing test of Rule 403).

This does not mean, of course, that evidence should be excluded under Rule 403 simply because it is prejudicial. All evidence, if it is relevant, is in some sense "prejudicial"; Rule

403, however, is concerned only with "unfair prejudice," which is limited to evidence that carries a genuine risk "that the emotions of the jury will be excited to irrational behavior, and that the risk is disproportionate to the probative value of the evidence." United States v. Fahey, 769 F.2d 829, 849 (1st Cir. 1985), *quoting* United States v. Zeuli, 725 F.2d 813, 817 (1st Cir. 1984)); *cf.* United States v. Guyon, 27 F.3d 723, 729 (1st Cir. 1984)("We agree that this evidence, like most evidence offered against a defendant, is prejudicial. . . . [T]he question is whether the probative value of the evidence was substantially outweighed by the danger of undue prejudice").

**Evidence of the Stabbing and the Defendant's Drug Dealing Should Be Admitted**

Here, the government seeks to introduce evidence that, prior to the discovery of the gun wrapped in the shirt, the defendant was involved in an altercation in which he stabbed Pedro Andrade. This evidence is admissible for three reasons. First, the stabbing incident is inextricably intertwined with the gun possession. The stabbing incident was the impetus for the defendant to remove the firearm from the glove compartment of his car immediately after the stabbing incident, which resulted in Lisa Sanders's observation of the defendant with the firearm in

his hand.[2]  In addition, according to the defendant, the stabbing incident was the immediate cause of his possession of the firearm, given his fear of reprisal following the stabbing.  The First Circuit has made clear that "[e]vidence which is probative of the crime charged, and not solely uncharged crimes, is not 'other crimes' evidence.  Further, where the evidence of an act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and Rule 404(b) is not implicated."  United States v. McCann, 366 F.3d 46, 54 (1st Cir. 2004); quoting United States v. DeLuna, 763 F.2d 897, 913 (8th Cir. 1985).  See also, e.g., United states v. Rosario-Diaz, 202 F.3d 54, 71 (1st Cir. 2000)(evidence of uncharged rape inseparably intertwined with charged carjacking and murder and accordingly properly admitted).  Here, the stabbing incident is inextricably intertwined with the defendant's gun possession and thus is not 404(b) evidence at all.

Further, even if it were 404(b) evidence, the Rule itself countenances introduction of other-acts evidence if probative either of identity or motive.  Here, evidence of the stabbing is probative of the defendant's identity as the possessor of the firearm, albeit in an unusual way.  The defendant admitted to

---

[2]Sanders cannot identify the firearm recovered definitively as the firearm she saw in the defendant's hand, but, given the recovery of a black handgun from the defendant's immediate presence a short time later, the jury can reasonably infer that it was the same gun.

stabbing Andrade.  A knife with Andrade's blood on it was found in the defendant's pocket.  The gun was found wrapped in a shirt that also had Andrade's blood on it.  This evidence all tends to point to the defendant as the possessor of the items found at 37 Ellsworth Street with Andrade's blood on them, as well as, in the case of the firearm, an item wrapped within an item bearing Andrade's blood.

The stabbing incident also provides an immediate motive for the defendant's possession of the firearm, another permissible basis for admitting other-acts evidence.  *See, e.g.,* United States v. DeCicco, 370 F.3d 206 (1st Cir. 2004).  The defendant told the police, in essence, that he had just retrieved the firearm from 37 Ellsworth Street as protection against reprisal for the stabbing.  Without evidence of the stabbing itself, the jury will not be in a position to assess this highly relevant motive evidence.

Similarly, the jury should hear the defendant's admission that he was selling drugs at the time of his alleged possession of the firearm.  Drug dealing provides a compelling motive for gun possession.  *See, e.g.,* United States v. Smith, 292 F.3d 90 (1st Cir. 2002).  It is particularly relevant in ths case, as it helps to explain why the defendant was, according to the Sanders evidence, carrying the firearm in the glove compartment of his car even before the stabbing incident.  The government expects

that, in the event Lisa Sanders is called to testify, her credibility will be attacked and the defendant will argue to the jury that her account of seeing the defendant with a gun should not be believed. The jury should not be deprived of evidence that tends to corroborate Sanders's testimony by showing that the defendant had a strong motive to be driving around with a firearm in his glove compartment even before the stabbing incident.

Moreover, the evidence should not be excluded as unduly prejudicial under Rule 403. Neither the stabbing incident nor the defendant's drug dealing is evidence carrying a genuine risk "that the emotions of the jury will be excited to irrational behavior, and that the risk is disproportionate to the probative value of the evidence." Fahey, 769 F.2d at 849, *quoting* Zeuli, 725 F.2d at 817. Given that the probative value of the evidence is extremely high and the risk of unfair prejudice is small, this Court should rule the evidence admissible.

**Facts Underlying Convictions and Arrests Should Be Excluded**

A potential government witness has certain convictions and arrests. With respect to the convictions, the defendant should be precluded from inquiring into any facts beyond the facts of the convictions themselves. With respect to arrests that did not result in convictions, the defendant should be precluded from inquiring altogether. The government addresses each conviction and arrest as follows.

11

**Leaving the Scene of an Accident**

The witness in question currently is serving the six-month committed portion of a two-year sentence arising out of a hit-and-run accident. One June 3, 2007, the witness was driving a car near a crowd of people and, according to the police report, struck a man who "went flying eight to ten feet in the air and landed directly on his face." The man was bleeding profusely. The witness continued in the direction of a police officer who happened to be in the area, only stopping when she came right up on him. The witness got out of the car and was hugging the injured man as the officer instructed her to stay at the scene. Nonetheless, she got back in the car, reportedly telling bystanders such things as, "I know it's fucked up, but I can't go to jail, I just panicked," and "fuck that shit . . . I ain't going to jail, I'm bouncing." She drove off but soon struck another vehicle and left the scene of that accident on foot, ultimately being apprehended by police officers.

A party is entitled to cross-examine a witness with respect only to the fact of a conviction, and not as to the facts underlying the conviction. See United States v. Capozzi, 486 F.3d 711, 721 n. 4 (1st Cir. 2007); Cummings v. Malone, 995 F.2d 817, 826 (8th Cir. 1993)("The ability to introduce the specific crime is not a license to flaunt its details, however; cross-examiners are limited to eliciting the name, date and disposition

of the felony committed"). Here, the defendant should be limited to eliciting the fact of this conviction and the resulting sentence. Eliciting details such as the nature of the injuries to the man who was struck and the colorful language purportedly employed by the witness would serve only unfairly to prejudice the jurors against the witness without contributing in a valid way to the jurors' assessment of the witness's credibility.

### Knowingly Receiving Stolen Property

In June 2007 the witness also was convicted of knowingly receiving stolen property and received a three-month sentence. The police report shows that on May 27, 2007, the witness was stopped driving a rental car that was 17 days past due and had been reported stolen. As indicated above, the defendant should be confined to questions regarding the fact of the conviction rather than the facts underlying the conviction.

### Assault and Battery Arrest

The witness was charged with assault and battery in January 2007 but the charges resulted in the case being continued without a finding. Accordingly, the defendant should be precluded from inquiring into the case at all.

### Operating After a Suspended License

In February 2005 the witness was charged with operating a motor vehicle with a suspended license, but the charge ultimately was dismissed. The police report indicates that on February 20,

2005, the witness was driving a vehicle and pulled up to where a man was standing.  A passenger engaged in conduct with this man that appeared to a surveilling officer to be consistent with a drug transaction.  The vehicle was pulled over and the witness, who had no license, gave her sister's name to the police.  The police eventually recovered 7 grams of crack cocaine from the passenger.

Again, this case resulted in no conviction, and thus the defendant should be precluded from inquiring into it.  At most, the defendant should be allowed to elicit that, in an encounter with the police in February 2005, the witness represented herself to be her sister.  Nothing else about the encounter will assist the jury in any valid way in assessing the witness's credibility: it was the passenger, not the witness, who was found in possession of drugs, and such possession is not, in any event, probative of one's truthfulness *vel non*.

### Sexual Conduct for a Fee

Finally, in August 2003 the witness was charged with engaging in sexual conduct for a fee, but this case, too, was dismissed.  According to the police report, the witness and another female were out on the street.  An undercover officer overheard them asking a motorist, "What are you looking for?" The motorist told them he was looking for a date and had money, and the two told him they had an apartment in Boston, at which

point the undercover officer approached the group.  Both the witness and the other female provided false identities to the officer.  All three provided accounts of what occurred that differed from what the officer had heard.

Again, the case was dismissed, and the defendant should not be permitted to inquire regarding it.  At most, the defendant should be permitted to elicit that the witness had an encounter with the police in August 2003 in which she did not provide her true name.

**Fact of Internal Affairs Inquiries Should Be Precluded**

Finally, the government understands that the defendant is in the process of obtaining information from closed Internal Affairs files concerning some members of the Brockton Police Department who may testify at trial.  The government does not yet have access to these materials and thus cannot represent what they contain, other than that it is the government's understanding that, in each instance, either the officer in question was exonerated, the allegation was unsubstantiated, or there was no inquiry because the formal complaint process was not followed.  Under the circumstances, the defendant should be precluded from inquiring of the officers regarding these closed files unless the defendant first identifies information he believes is legitimate impeachment material and affords the government an opportunity to respond.

**CONCLUSION**

For the foregoing reasons, this Court should rule that evidence of the stabbing and the defendant's drug dealing are admissible, while evidence of the witness's criminal history should be limited to the fact of any convictions, and cross-examination regarding closed Internal Affairs files should be precluded absent some showing that a legitimate basis for such inquiry exists.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /S/Robert E. Richardson
     ROBERT E. RICHARDSON
     Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I, Robert E. Richardson, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 25, 2007.

/s/Robert E. Richardson
ROBERT E. RICHARDSON