UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10306-PBS |
| | ) | |
| TREVOR CHARLTON | ) | |

DEFENDANT'S SENTENCING MEMORANDUM

<u>INTRODUCTION</u>

Trevor Charlton was found guilty on December 10, 2007 on an indictment charging him with one count of being a felon in possession of a firearm.  Mr. Charlton requests that the court impose a sentence of 15 years (180 months) to be followed by 3 years of supervised release.  Under the circumstances of this case, which include: (1) wrongful conduct by a victim (Pedro Andrade) which contributed significantly to provoking the offense behavior, (2) an extraordinarily traumatic childhood with serious lack of parental guidance and, (3) that Mr. Charlton is presently in immigration removal proceedings by ICE, 15 years is a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).  <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005); U.S.S.G. § 5K2.10.

BACKGROUND[1]

The instant offenses occurred on July 25, 2004.  There were two trials of this matter.  The first ended in a mistrial on March 20, 2006.  On December 10, 2007, after a second trial, Mr. Charlton was found guilty of the single count indictment.  The Probation Department has determined that Mr. Charlton's guideline sentencing range is 235-293 months (19 years 7 months-24 years 5 months).

I.  Mr. Charlton's Background

At the time of his arrest, Mr. Charlton was 28 years old.  Mr. Charlton was born in Clarendon, Jamaica to Susan Myrie and Trevor Charlton, Sr.  He was raised by his mother in Jamaica until he was nine years old at which time he was sent to the United States to live with his father.

During Mr. Charlton's childhood his father was abusive.  This abuse is documented by the Massachusetts Department of Social Services (DSS) and involved his father neglecting him, abusing alcohol and beating him with a belt regularly.  Ultimately, when Trevor Charlton was a teenager he was removed

---

[1] The facts are gleaned from the Presentence Report of February 5, 2008, information from the defendant, DSS records (relevant portions attached as Addendum A, complete set available for review) and various medical records including Human Resources Institute, Brookline MA and Boston Children's Hospital (which are available for review).

-2-

from his father and was placed in hospitals, foster homes and emergency placements and in the care of a guardian.

In 1991 when Trevor was sixteen he ran away from home. When he was located and brought to the police station he told the police about the abuse and stated that it had been going on for awhile. Mr. Charlton's father admitted to the police that he hit the children with a belt and a wet towel and that he left marks. A petition alleging abuse and neglect was filed by DSS and Mr. Charlton was removed from his home and sent to live with his paternal grandmother. Soon thereafter, he was placed in a foster home where he continued to struggle and began committing crimes. When he was 16, he was arrested for possession of a class B substance. At that time, a probation officer was reluctant to release him to go home as he believed that Mr. Charlton was being physically abused and was "crying out for help." Addendum A.

DSS assumed custody of Mr. Charlton in January 1992. In February 1992, Mr. Charlton revealed that he was having suicidal thoughts. Mr. Charlton presented as depressed and suicidal leading him to be hospitalized again at Human Resources Institute in Brookline for over 2 months. Addendum A. At that time he was treated for major depression and possible Post-Traumatic Stress Disorder, Conduct Disorder, Adolescent Adjustment Reaction and Learning Disorder.

-3-

Mr. Charlton began to be treated with anti-depressant medication, which his father opposed. The doctor at HRI felt that "Trevor needed to develop himself and stop taking the responsibility of his father's behavior on himself." Addendum A. He also felt that a family home environment was unbearable for the teenaged Charlton as the contrast between a functioning foster family and his own home was overwhelming. The doctors felt that this was part of the reason for Charlton's acting out even when in a safe "good home environment." Addendum A. For this purpose, Charlton was placed in a Community Care facility from which he ultimately ran away. Because he was on probation, he was placed into the custody of the Department of Youth Services (DYS). He was discharged from DYS at age 18.

Although Mr. Charlton has never married, for the past 10 years he has been in a committed relationship with Danyia Simpson. They have a child Rayonna Charlton. His daughter is now eight and lives with Ms. Simpson in Stoughton, MA. Mr. Charlton was consistently involved in the care of the child, including taking her to school and picking her up everyday. Ms. Simpson and Mr. Charlton continue to have a supportive relationship and are in good standing at this time. Ms. Simpson refers to Mr. Charlton as a man who is a "good person and father." PSR ¶ 86.

Mr. Charlton has lived in the United States since June 27,
1985, when he was nine.  He is legally in the United States but
is presently in ICE removal proceedings.  PSR ¶ 82.  He has been
detained in this case in difficult pretrial conditions at
Plymouth County House of Corrections since August 5, 2005.[2]
Given his criminal conviction in the present case, deportation is
a certainty.

II.  The Trial

The evidence at trial indicated that contrary to the
government's contentions, Mr. Charlton did not have a firearm at
83 Forest Avenue in the glove compartment of his car, where he
was attacked by Pedro Andrade.  Rather, he only possessed the
handgun after he returned to 37 Ellsworth Street.

The testimony of the police officers was that Mr. Charlton
made a statement about what had happened and how he came to have
the gun.  He told them that he went to 83 Forest Avenue to see
Lisa Sanders.  He did not have a gun with him.  While sitting in
his car in the parking lot he was violently attacked from behind
by a masked man dressed in black.  The man began choking him and
forced his head down toward the steering wheel.  Mr. Charlton
defended himself with a knife and eventually his attacker
retreated.  Mr Charlton then left the area by cab and returned to

---

[2] He was detained on state charges from the date of his
arrest from July 2004 until August 5, 2005.

where he was then staying at 37 Ellsworth Street.  He told the police that he was afraid that the person he stabbed (later determined to be Pedro Andrade) would pursue him, so upon his arrival at 37 Ellsworth, he went into the hallway and recovered a gun that his friends had left there for him.  He told the police that he retrieved the gun because he felt his life was in danger. When the police arrived, minutes later, he was standing near the gun which was wrapped in his sweatshirt.  This version of events is consistent both with the credible evidence at the trial and the verdict.  Assuming the alternative, that Charlton had the gun at 83 Forest Avenue, makes little sense because if Charlton had the gun with him at 83 Forest Avenue, he would have most likely reached into the glove compartment for it when he was being attacked rather than struggling to get a knife out of his pocket.

The government's statement of offense conduct relies upon the testimony of Lisa Sanders as its argument to the jury did.[3] However, the jury did not need to believe Ms. Sanders in order to find the defendant guilty and neither does this Court in sentencing Mr. Charlton.  In fact, the Assistant United States Attorney made that very point in his closing argument:

> And actually...I suggest to you that...you don't even need Lisa Sanders.  You can put her completely to one side

---

[3] The government did not choose to call Lisa Sanders at the first trial.

because the evidence...on its own shows beyond a reasonable
doubt that the defendant possessed the firearm.  Tr. V 14-
15.[4]

Ms. Sander's credibility was significantly undermined during
cross examination and her story that she knew nothing of the
planned attempted robbery by Pedro Andrade, the brother of her
mother's husband, was beyond belief.  The most plausible
inference from the evidence is that she told Andrade that
Charlton was coming over and set him up to be robbed.

The Assistant United States Attorney summarized the problems
with Ms. Sander's credibility in his closing argument as follows:

Okay, so let's talk about Lisa Sanders herself for a moment
because, again, as I told you at the very outset of the
case, I told you you were going to learn things about her
that you wouldn't like, and you now have learned things
about her that I'm sure you don't like.  You know that she
was convicted of leaving the scene of an accident, and you
know that she was convicted of possession of stolen
property, and you know that she served six months as a
result of that.

You know that on two occasions when she had encounters with
the Brockton Police Department and thought she might herself
be getting into some sort of trouble, she gave them her
sister's name, not her own name, her sister's name, in order
to get herself out of what she perceived might be a scrape
that might end up getting her in trouble.

You know that she smoked marijuana for a number of years,
stopped it, I believe she said in May of 2007, this year,
but she used marijuana for several years.  And you know that
she lost a job at Filene's a couple of years ago for taking
some money.

---

[4] Transcript of the trial will be cited as "Tr." followed by
the day of trial, followed by the page.

And then in connection with this case, you know that on two occasions, the first two times she spoke to authorities, the night of July 25 of 2004 and then when she came to this building and spoke with the two detectives and a different Assistant U.S. Attorney, Ms. Marianne Hinkle, she didn't tell them everything she knew.  That first time she saw the police outside she didn't tell them anything about having seen somebody in black run up and start fighting with the defendant, didn't tell them anything about a struggle, didn't tell them anything about having seen a gun.  When she first came to this building on September 15 of '04, she didn't say anything about those same topics.  And in fact at that point, the evidence shows you that Ms. Hinkle says, "We don't think you're telling us the whole truth.  We think you're lying.  We think, you know, it just doesn't make sense," and told her she was going to be going into a Federal Grand Jury, and pointed out that lying under oath before a Federal Grand Jury is an offense for which somebody might eventually go to jail.  And it was at that point that Lisa  Sanders told them everything she knew:  told them about the guy in black running up starting to choke the defendant; told them about the struggle, which she said she couldn't see that much of because she ended up backing up around the car, and what was happening was over there on the shadowy side of the car; and told them about seeing the defendant get the gun out of the glove compartment and come out of the car with it afterwards after having pulled the gun back.  Tr. V 11-12.

<u>ARGUMENT</u>

I.    A sentence of fifteen years, which is the mandatory minimum under 18 U.S.C. § 924(e), the Armed Career Criminal enhancement, is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in § 3553(a)(2).

Under the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005) a court must look to 18 U.S.C. § 3553(a), and impose a sentence which is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in § 3553(a)(2).  <u>Booker</u>, 543 U.S. 220 at 259-260, 125 S.Ct. at 764-65.  In imposing sentence, the Court

must consider all of the factors set forth in § 3553(a)(1)-(7).
The sentencing guidelines are no longer binding on the court.
Id.

  1. Nature and circumstances of the offense and the
     history and characteristics of the defendant
     (§ 3553(a)(1)).

**Nature and Circumstances of the Offense**

The credible evidence at trial was that Mr. Charlton's
possession of the firearm arose as result of his being violently
attacked by a hooded stranger in a dark parking lot at 83 Forest
Avenue in Brockton.  During the assault, Charlton used a knife to
fend off his attacker, who ultimately retreated.  Charlton's
assailant stole his car keys.  Fearing for his life and fearing
that his attacker might return, Charlton called a cab and
proceeded to where he was staying at 37 Ellsworth Street.  Upon
his arrival, he recovered a gun which he felt he needed to
protect himself.  Mr. Charlton committed the offense under
serious provocation from the victim, as argued more fully infra,
pp. 11-16.

**History and Characteristics of Defendant**

Mr. Charlton's childhood became difficult when at age nine
he was sent away to the United States to live with his father.
At that time, his relationship with his mother, his family and
his home in Jamaica was abruptly terminated.  Life took a
dramatic turn for the worse as Mr. Charlton's father was abusive

-9-

often beating him with a belt.  The abuse, which is documented by the Massachusetts Department of Social Services (DSS), involved both, neglect and physical beatings.  Ultimately, when Mr. Charlton was a teenager he was removed from his father and placed in a series of hospitals, foster homes, emergency placements, in the care of a guardian, and finally into the custody of the Department of Youth Services.  As a teenager, Charlton presented as depressed and suicidal, which resulted in his hospitalization at the Human Resources Institute in Brookline for over two months.  He continues to suffer from anxiety and depression and is presently being treated with Seroquel.

    2.   The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" (§ 3553(a)(2)(A)).

A sentence of 15 years followed by three years of supervised release is severe and adequate to reflect the goal of this factor.

    3.   The need for the sentence "to afford adequate deterrence to criminal conduct" (§ 3553(a)(2)(B)).

A 15 year sentence provides a strong deterrent.

    4.   The need for the sentence "to protect the public from further crimes of the defendant" (§ 3553(a)(2)(c)).

A 15 year sentence for this 32 year old man will protect the public from further crimes.  When Mr. Charlton is released he will be in his mid forties.  It is well settled that recidivism decreases with age.  Furthermore, Mr. Charlton will be on

supervised release for three years during which time he will be supervised and supported by the United States Probation Department which will also serve to further protect the public. Finally, Mr. Charlton will be deported following whatever term of imprisonment is imposed.

> 5. The need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" (§ 3553(a)(2)(D)).

Trevor Charlton intends to avail himself of educational and employment opportunities while in prison.

> 6. The "kinds of sentences available" (§ 3553(a)(3)).

The sentence Charlton proposes, 15 years imprisonment followed by three years of supervised release, is available to the court.

> 7. The "kinds of sentence and sentencing range" established under the Guidelines and "any pertinent policy statement" (§ 3553(a)(4) & (5)).

I.  Victim's wrongful conduct contributed significantly to provoking the offense behavior.

Where the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. U.S.S.G. § 5K2.10. In determining whether a sentence reduction is warranted, and the

extent of such reduction, the court should consider the
following:

    (1)   The size and strength of the victim, or other relevant
           physical characteristics, in comparison with those of
           the defendant.

    (2)   The persistence of the victim's conduct and any efforts
           by the defendant to prevent confrontation.

    (3)   The danger reasonably perceived by the defendant,
           including the victims reputation for violence.

    (4)   The danger actually presented to the defendant by the
           victim.

    (5)   Any other relevant conduct by the victim that
           substantially contributed to the danger presented.

    (6)   The proportionality and reasonableness of the
           defendant's response to the victim's provocation.

           U.S.S.G. § 5K2.10

Victim misconduct is an encouraged basis for departure under
the Guidelines. <u>Koon v. United States</u>, 518 U.S. 81 (1996);
U.S.S.G. § 5K2.10.  In <u>Koon</u> police officers were convicted of
violating the victim's constitutional rights under color of law.
The facts were that the officers used excessive force including
taser darts, when the victim, who prior to the offense had
refused to lie down, became combative while being arrested.  The
Court held that the district court had acted within its

discretion in granting a five level departure because the suspect's misconduct contributed significantly to provoking the defendants' offense behavior.

A response need not immediately follow an action in order to be provoked by it. Koon, 518 U.S. at 104, United States v. Lavallee, 439 F.3d 670, 708 (10th Cir. 2006). "A defendant need not prove the elements of a justification defense in order to obtain a downward departure on the basis of the victim's wrongful conduct." United States v. Harris, 293 F.3d 863, 872 (5th Cir. 2002), quoting Koon, 518 U.S. at 102. For example, in Koon, the Supreme Court sustained the district court's downward departure despite its unassailed finding that at the time of the offense behavior the victim "was no longer resisting arrest. He posed no objective threat, and the defendant had no reasonable perception of danger." United States v. Harris, 293 F.3rd 863, 872 (5th Cir. 2002), quoting Koon, 518 U.S. at 102.

This Court has recognized before that victim provocation that occurs some time before an offense is a valid basis for departure. In United States v. Benjamin Lewis 98-10168-PBS, this Court departed from 262 months to 216 months on the ground that the victim's unjustified mayhem upon the defendant's girlfriend 20 minutes earlier significantly contributed to the offense behavior.

Courts have upheld departures where the defendant's response was proportionate to the victim's misconduct, looking to the six factors contained in U.S.S.G. § 5K2.10.  In <u>Lavallee</u> an inmate had made sexually explicit remarks to a female fellow officer and had threatened and made an aggressive move towards the defendant. The Court found that this provocative conduct significantly contributed to the assault upon the victim.  <u>Lavallee</u>, 439 F.3d 670 (10th Cir. 2006).  In <u>United States v. Harris</u>, 293 F.3d 863 (5th Cir. 2002), the defendant police officer "back handed" the victim with a baton.  The court found a departure warranted because the victim was intoxicated and thrashing around violently in defendant's police cruiser even after having been sprayed with pepper spray.  <u>Id</u>. at 874-875.  In <u>United States v. Tsosie</u>, 14 F.3d 1438 (10th Cir. 1994) the defendant stabbed and killed the victim who had been having an affair with his wife.  The court found a departure appropriate because the victim was unexpectedly seen in a car with the defendant's wife, the victim "actively participated" in the ensuing physical confrontation with defendant, and struck defendant with his belt during the affray. <u>Tsosie</u>, 14 F.3d at 1442.

In <u>United States v. Yellow Earrings</u>, 891 F.2d 650 (8th Cir. 1989), the court upheld a departure where the defendant stabbed the victim who, while intoxicated, pushed, verbally abused and attempted to sexually abuse defendant.  In <u>United States v.</u>

DeJesus, 75 F.Supp.2d 141 (S.D. N.Y. 1999), the victim beat and injured his sister, defendant's girlfriend, and threatened defendant.  Where the ensuing attempted assault on the victim involved defendant gathering a group of Latin King members and planning to assault the victim with guns and knives, the court departed because the victim's conduct contributed significantly to the offense.  The court noted that the offense occurred on the same day and was a direct response to immediate provocation and that the provocation involved actual violence as well as threats. DeJesus, 75 F.Supp.2d at 146.

This case is clearly distinguishable from cases in which courts have found a departure unwarranted because the defendant's conduct was disproportionate to the victim's provocation.  See, Blankenship v. United States, 159 F.3d 336, 338-339 (8th Cir. 1998)(recognizing that the policy behind U.S.S.G. § 5K2.10 "manifests a concern for proportionality in the defendant's response" and finding that defendant's escalating the confrontation by leaving and returning with a loaded weapon which went off killing the victim was disproportionate to victim's unarmed, non-violent conduct); United States v. Desormeaux, 952 F.2d 182, 186 (finding departure unwarranted where defendant stabbed victim causing serious bodily injury and victim's conduct, when seen with defendant's boyfriend, amounted to only a "breach of dating etiquette"); United States v. Short, 991 F.2d

1325, 1328 (8th Cir. 1990)(finding though "certainly wrongful and provocative, adultery does not justify blowing up the adulterers, or building a bomb capable of doing so").

A downward departure to 15 years is warranted in the instant case where Mr. Charlton's misconduct was provoked by Andrade's attack, and the response was immediate and proportionate to Andrade's actions. Prior to the incident, which appears to have been an attempted robbery, Charlton was seated in his car talking to Lisa Sanders who was in her driveway. Suddenly a man dressed in black, concealing his face, ran up to Mr. Charlton surprising and terrifying him. He then attacked Charlton from behind, grabbing him around the neck and pressing his face into the steering wheel. Mr. Charlton defended himself, fending off his attacker with a knife. Only after these events did he return home and obtain a firearm for protection.

In determining that a sentence reduction is warranted and deciding the extent of that reduction, this Court should consider several factors. Mr. Charlton's attacker, Pedro Andrade, was a young muscular male who was able to grab Mr. Charlton around the neck and hold him until Charlton defended himself with a knife. Mr. Charlton did not provoke or initiate the confrontation; rather he was the innocent victim of an attack. Andrade's actions clearly showed his violent and unpredictable tendencies. Mr. Charlton was reasonable in his fear of Andrade and his belief

-16-

that Andrade might come looking for him.  Charlton was actually

put in danger by Andrade's conduct and could have been strangled.

Andrade's decision to conceal his identity, sneak up upon and

attack a defenseless, unsuspecting man demonstrates the depravity

of his conduct and the risk of future attacks.  Under the cases

cited above, a departure is warranted.

II.  The Armed Career Criminal enhancement under 18 U.S.C.
     § 924(e) should not apply where the three convictions
     upon which the enhancement was based were neither proven
     beyond a reasonable doubt nor admitted by defendant.

    Recognizing that the First Circuit has ruled in United

States v. Jiminez-Beltre, 440 F.3d 514 (1st Cir. 2006), that the

court must follow Almendarez-Torres v. United States, 523 U.S.

224 (1998), permitting use of prior convictions to enhance a

sentence without proof to a jury beyond a reasonable doubt until

the Supreme Court expressly overrules it, defendant makes the

following argument to preserve his rights.  The defendant's three

prior convictions should not be used to enhance his sentence

where they were neither proven beyond a reasonable doubt nor

admitted by defendant.  Without these convictions used to enhance

the sentence, the Guideline sentence for the defendant is 100-125

months (8 years 4 months-10 years 5 months).  See PSR ¶ 40.

    The rule excepting prior convictions from a requirement of

proof beyond a reasonable doubt was recognized in Apprendi v. New

Jersey, 530 U.S. 466 (2000); Almendarez-Torres v. United States,

523 U.S. 224 (1998); and United States v. Booker, 125 S.Ct. 738

-17-

(2005).  It was of questionable constitutional validity from the start, its theoretical underpinnings have now been rejected, and a majority of the Supreme Court is poised to overrule it.  The rule first recognized in Almendarez-Torres that excepted prior convictions from the requirement that they be pled in an indictment was based upon a distinction between elements and sentencing factors which has since been rejected by the Supreme Court.  The Court, in later cases that have not squarely presented the issue of the requirements of proof and pleading of prior convictions, has indicated that Almendarez-Torres may have been wrongly decided and that a majority would, in an appropriate case, overturn the decision and eliminate the prior conviction exception.  Where a statute may be construed two ways, one of which raises doubtful constitutional issues, and the other of which avoids them, the latter construal should be adopted.  This Court should apply the doctrine of constitutional avoidance to hold that, since no facts of any prior convictions were proved or admitted, it was error to apply 18 U.S.C. § 924(e).

## CONCLUSION

For the foregoing reasons, and after giving substantial weight to the guidelines and considering all of the sentencing

-18-

factors in 18 U.S.C. § 3553(a), Trevor Charlton requests the

Court impose a sentence of 15 years (180 months) imprisonment.

                                        TREVOR CHARLTON
                                        By his attorney,


                                        /s/ Catherine K. Byrne
                                        Catherine K. Byrne
                                          B.B.O. #543838
                                        Federal Defender Office
                                        408 Atlantic Avenue, 3rd Floor
                                        Boston, MA  02110
                                        Tel: 617-223-8061

                            CERTIFICATE OF SERVICE

I, Catherine K. Byrne, hereby certify that this document(s) filed
through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic
Filing (NEF) and paper copies will be sent to those indicated as
non-registered participants on June 4, 2008.



                                        /s/ Catherine K. Byrne
                                        Catherine K. Byrne__